(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## OPATI, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF OPATI, DECEASED, ET AL. *v.* REPUBLIC OF SUDAN ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 17–1268.　Argued February 24, 2020—Decided May 18, 2020

In 1998, al Qaeda operatives detonated truck bombs outside the United States Embassies in Kenya and Tanzania. Victims and their family members sued the Republic of Sudan under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act (FSIA), formerly 28 U. S. C. §1605(a)(7), alleging that Sudan had assisted al Qaeda in perpetrating the attacks. At the time, the plaintiffs faced §1606's bar on punitive damages for suits proceeding under any of the §1605 sovereign immunity exceptions. In 2008, Congress amended the FSIA in the National Defense Authorization Act (NDAA). 122 Stat. 3. In NDAA §1083(a), Congress moved §1605(a)(7) to a new section and created an express federal cause of action for acts of terror that also provided for punitive damages. See §1605A(c). In §1083(c)(2), it gave effect to existing lawsuits that had been "adversely affected" by prior law "as if" they had been originally filed under the new §1605A(c). And in §1083(c)(3), it provided a time-limited opportunity for plaintiffs to file new actions "arising out of the same act or incident" as an earlier action and claim §1605A's benefits. Following these amendments, the original plaintiffs amended their complaint to include the new federal cause of action under §1605A(c), and hundreds of others filed new, similar claims. The district court entered judgment for the plaintiffs and awarded approximately $10.2 billion in damages, including roughly $4.3 billion in punitive damages. As relevant here, the court of appeals held that the plaintiffs were not entitled to punitive damages because Congress had included no statement in NDAA §1083 clearly authorizing punitive damages for preenactment conduct.

Syllabus

*Held*: Plaintiffs in a federal cause of action under §1605A(c) may seek punitive damages for preenactment conduct. Even assuming (without granting) that Sudan may claim the benefit of the presumption of prospectivity—the assumption that Congress means its legislation to apply only to future conduct, see *Landgraf* v. *USI Film Products*, 511 U. S. 244—Congress was as clear as it could have been when it expressly authorized punitive damages under §1605A(c) and explicitly made that new cause of action available to remedy certain past acts of terrorism.

Sudan stresses that §1083(c) does not *itself* contain an express authorization of punitive damages. It does admit that §1083(c) authorizes plaintiffs to bring §1605A(c) claims for preenactment conduct. And it does concede that §1605A(c) allows for damages that "may include economic damages, solatium, [and] pain and suffering" for preenactment conduct. That list in the statute also "include[s] . . . punitive damages," and no plausible account of §1083(c) could be clear enough to authorize the retroactive application of all other §1605A(c) features except punitive damages. Sudan also contends that §1605A(c)'s wording "may include . . . punitive damages" fails the clarity test. But "'the word "may" clearly connotes discretion,'" *Halo Electronics, Inc.* v. *Pulse Electronics, Inc.*, 579 U. S. ___, ___, and simply vests district courts with discretion to determine whether punitive damages are appropriate. In addition, all of the categories of special damages mentioned in §1605A(c) are provided on equal terms. Finally, Sudan suggests that a super-clarity rule should apply here because retroactive punitive damages raise special constitutional concerns. Such an interpretative rule is not reasonably administrable.

This Court declines to resolve other matters raised by the parties outside the question presented. But having decided that punitive damages are permissible for federal claims and that the reasons the court of appeals offered for its contrary decision were mistaken, it follows that the court of appeals must also reconsider its decision concerning the availability of punitive damages for claims proceeding under state law. Pp. 6–12.

864 F. 3d 751, vacated and remanded.

GORSUCH, J., delivered the opinion of the Court, in which all other Members joined, except KAVANAUGH, J., who took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–1268

MONICAH OKOBA OPATI, IN HER OWN RIGHT, AND AS EXECUTRIX OF THE ESTATE OF CAROLINE SETLA OPATI, DECEASED, ET AL., PETITIONERS *v.* REPUBLIC OF SUDAN, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[May 18, 2020]

JUSTICE GORSUCH delivered the opinion of the Court.

In 1998, al Qaeda operatives simultaneously detonated truck bombs outside the United States Embassies in Kenya and Tanzania. Hundreds died, thousands were injured. In time, victims and their family members sued the Republic of Sudan in federal court, alleging that it had assisted al Qaeda in perpetrating the attacks. After more than a decade of motions practice, intervening legislative amendments, and a trial, the plaintiffs proved Sudan's role in the attacks and established their entitlement to compensatory and punitive damages. On appeal, however, Sudan argued, and the court agreed, that the Foreign Sovereign Immunities Act barred the punitive damages award. It is that decision we now review and, ultimately, vacate.

\*

The starting point for nearly any dispute touching on foreign sovereign immunity lies in *Schooner Exchange* v. *McFaddon*, 7 Cranch 116 (1812). There, Chief Justice Mar-

shall explained that foreign sovereigns do not enjoy an in-
herent right to be held immune from suit in American
courts: "The jurisdiction of the nation within its own terri-
tory is necessarily exclusive and absolute.  It is susceptible
of no limitation not imposed by itself."  *Id.,* at 136.  Still,
Chief Justice Marshall continued, many countries had de-
clined to exercise jurisdiction over foreign sovereigns in
cases involving foreign ministers and militaries.  *Id.,* at
137–140.  And, accepting a suggestion from the Executive
Branch, the Court agreed as a matter of comity to extend
that same immunity to a foreign sovereign in the case at
hand.  *Id.,* at 134, 145–147.

For much of our history, claims of foreign sovereign im-
munity were handled on a piecework basis that roughly
paralleled the process in *Schooner Exchange*.  Typically, af-
ter a plaintiff sought to sue a foreign sovereign in an Amer-
ican court, the Executive Branch, acting through the State
Department, filed a "suggestion of immunity"—case-spe-
cific guidance about the foreign sovereign's entitlement to
immunity.  See *Verlinden B. V.* v. *Central Bank of Nigeria*,
461 U. S. 480, 487 (1983).  Because foreign sovereign im-
munity is a matter of "grace and comity," *Republic of Aus-
tria* v. *Altmann*, 541 U. S. 677, 689 (2004), and so often im-
plicates judgments the Constitution reserves to the political
branches, courts "consistently . . . deferred" to these sugges-
tions.  *Verlinden*, 461 U. S., at 486.

Eventually, though, this arrangement began to break
down.  In the mid-20th century, the State Department
started to take a more restrictive and nuanced approach to
foreign sovereign immunity.  See *id.,* at 486–487.  Some-
times, too, foreign sovereigns neglected to ask the State De-
partment to weigh in, leaving courts to make immunity de-
cisions on their own.  See *id.,* at 487–488.  "Not
surprisingly" given these developments, "the governing
standards" for foreign sovereign immunity determinations
over time became "neither clear nor uniformly applied." *Id.,*

at 488.

In 1976, Congress sought to remedy the problem and address foreign sovereign immunity on a more comprehensive basis. The result was the Foreign Sovereign Immunities Act (FSIA). As a baseline rule, the FSIA holds foreign states and their instrumentalities immune from the jurisdiction of federal and state courts. See 28 U. S. C. §§1603(a), 1604. But the law also includes a number of exceptions. See, *e.g.,* §§1605, 1607. Of particular relevance today is the terrorism exception Congress added to the law in 1996. That exception permits certain plaintiffs to bring suits against countries who have committed or supported specified acts of terrorism and who are designated by the State Department as state sponsors of terror. Still, as originally enacted, the exception shielded even these countries from the possibility of punitive damages. See Antiterrorism and Effective Death Penalty Act of 1996 (codifying state-sponsored terrorism exception at 28 U. S. C. §1605(a)(7)); §1606 (generally barring punitive damages in suits proceeding under any of §1605's sovereign immunity exceptions).

Two years after Congress amended the FSIA, al Qaeda attacked the U. S. Embassies in Kenya and Tanzania. In response, a group of victims and affected family members led by James Owens sued Sudan in federal district court, invoking the newly adopted terrorism exception and alleging that Sudan had provided shelter and other material support to al Qaeda. As the suit progressed, however, a question emerged. In its recent amendments, had Congress merely withdrawn immunity for state-sponsored terrorism, allowing plaintiffs to proceed using whatever pre-existing causes of action might be available to them? Or had Congress gone further and created a new federal cause of action to address terrorism? Eventually, the D. C. Circuit held that Congress had only withdrawn immunity without creating a new cause of action. See *Cicippio-Puelo* v. *Islamic*

*Republic of Iran*, 353 F. 3d 1024, 1033 (2004).

In response to that and similar decisions, Congress amended the FSIA again in the National Defense Authorization Act for Fiscal Year 2008 (NDAA), 122 Stat. 338. Four changes, all found in a single section, bear mention here. First, in §1083(a) of the NDAA, Congress moved the state-sponsored terrorism exception from its original home in §1605(a)(7) to a new section of the U. S. Code, 28 U. S. C. §1605A. This had the effect of freeing claims brought under the terrorism exception from the FSIA's usual bar on punitive damages. See §1606 (denying punitive damages in suits proceeding under a sovereign immunity exception found in §1605 but not §1605A). Second, also in §1083(a), Congress created an express federal cause of action for acts of terror. This new cause of action, codified at 28 U. S. C. §1605A(c), is open to plaintiffs who are U. S. nationals, members of the Armed Forces, U. S. government employees or contractors, and their legal representatives, and it expressly authorizes punitive damages. Third, in §1083(c)(2) of the NDAA, a provision titled "Prior Actions," Congress addressed existing lawsuits that had been "adversely affected on the groun[d] that" prior law "fail[ed] to create a cause of action against the state." Actions like these, Congress instructed, were to be given effect "as if" they had been originally filed under §1605A(c)'s new federal cause of action. Finally, in §1083(c)(3) of the NDAA, a provision titled "Related Actions," Congress provided a time-limited opportunity for plaintiffs to file *new* actions "arising out of the same act or incident" as an earlier action and claim the benefits of 28 U. S. C. §1605A.

Following these amendments, the *Owens* plaintiffs amended their complaint to include the new federal cause of action, and hundreds of additional victims and family members filed new claims against Sudan similar to those in *Owens*. Some of these new plaintiffs were U. S. nationals or federal government employees or contractors who sought

relief under the new §1605A(c) federal cause of action. But others were the foreign-national family members of U. S. government employees or contractors killed or injured in the attacks. Ineligible to invoke §1605A(c)'s new federal cause of action, these plaintiffs relied on §1605A(a)'s state-sponsored terrorism exception to overcome Sudan's sovereign immunity and then advance claims sounding in state law.

After a consolidated bench trial in which Sudan declined to participate, the district court entered judgment in favor of the plaintiffs. District Judge John Bates offered detailed factual findings explaining that Sudan had knowingly served as a safe haven near the two United States Embassies and allowed al Qaeda to plan and train for the attacks. The court also found that Sudan had provided hundreds of Sudanese passports to al Qaeda, allowed al Qaeda operatives to travel over the Sudan-Kenya border without restriction, and permitted the passage of weapons and money to supply al Qaeda's cell in Kenya. See *Owens* v. *Republic of Sudan*, 826 F. Supp. 2d 128, 139–146 (DC 2011).

The question then turned to damages. Given the extensive and varied nature of the plaintiffs' injuries, the court appointed seven Special Masters to aid its factfinding. Over more than two years, the Special Masters conducted individual damages assessments and submitted written reports. Based on these reports, and after adding a substantial amount of prejudgment interest to account for the many years of delay, the district court awarded a total of approximately $10.2 billion in damages, including roughly $4.3 billion in punitive damages to plaintiffs who had brought suit in the wake of the 2008 amendments.

At that point, Sudan decided to appear and appeal. Among other things, Sudan sought to undo the district court's punitive damages award. Generally, Sudan argued, Congress may create new forms of liability for past conduct only by clearly stating its intention to do so. And, Sudan

continued, when Congress passed the NDAA in 2008, it no-where clearly authorized punitive damages for anything countries like Sudan might have done in the 1990s.

The court of appeals agreed. It started by addressing the plaintiffs who had proceeded under the new federal cause of action in §1605A(c). The court noted that, in passing the NDAA, Congress clearly authorized individuals to use the Prior Actions and Related Actions provisions to bring new federal claims attacking past conduct. Likewise, the law clearly allowed these plaintiffs to collect compensatory damages for their claims. But, the court held, Congress included no statement clearly authorizing *punitive* damages for preenactment conduct. See *Owens* v. *Republic of Sudan*, 864 F. 3d 751, 814–817 (CADC 2017). Separately but for essentially the same reasons, the court held that the for-eign-national family member plaintiffs who had proceeded under state-law causes of action were also barred from seeking and obtaining punitive damages. *Id.,* at 817.

The petitioners responded by asking this Court to review the first of these rulings and decide whether the 2008 NDAA amendments permit plaintiffs proceeding under the federal cause of action in §1605A(c) to seek and win puni-tive damages for past conduct. We agreed to resolve that question. 588 U. S. ___ (2019).

\*

The principle that legislation usually applies only pro-spectively "is deeply rooted in our jurisprudence, and em-bodies a legal doctrine centuries older than our Republic." *Landgraf* v. *USI Film Products*, 511 U. S. 244, 265 (1994). This principle protects vital due process interests, ensuring that "individuals . . . have an opportunity to know what the law is" before they act, and may rest assured after they act that their lawful conduct cannot be second-guessed later. *Ibid.* The principle serves vital equal protection interests as well: If legislative majorities could too easily make new

laws with retroactive application, disfavored groups could become easy targets for discrimination, with their past actions visible and unalterable. See *id.,* at 266–267. No doubt, reasons like these are exactly why the Constitution discourages retroactive lawmaking in so many ways, from its provisions prohibiting *ex post facto* laws, bills of attainder, and laws impairing the obligations of contracts, to its demand that any taking of property be accompanied by just compensation. See *id.,* at 266.

Still, Sudan doesn't challenge the constitutionality of the 2008 NDAA amendments on these or any other grounds— the arguments we confront today are limited to the field of statutory interpretation. But, as both sides acknowledge, the principle of legislative prospectivity plays an important role here too. In fact, the parties devote much of their briefing to debating exactly how that principle should inform our interpretation of the NDAA.

For its part, Sudan points to *Landgraf.* There, the Court observed that, "in decisions spanning two centuries," we have approached debates about statutory meaning with an assumption that Congress means its legislation to respect the principle of prospectivity and apply only to future conduct—and that, if and when Congress wishes to test its power to legislate retrospectively, it must say so "clear[ly]." *Id.,* at 272. All this is important, Sudan tells us, because when we look to the NDAA we will find no *clear* statement allowing courts to award punitive damages for past conduct.

But if Sudan focuses on the rule, the petitioners highlight an exception suggested by *Altmann.* Because foreign sovereign immunity is a gesture of grace and comity, *Altmann* reasoned, it is also something that may be withdrawn retroactively without the same risk to due process and equal protection principles that other forms of backward-looking legislation can pose. Foreign sovereign immunity's "principal purpose," after all, "has never been to permit foreign

states . . . to shape their conduct in reliance on the promise of future immunity from suit in United States courts." 541 U. S*.,* at 696. Thus, *Altmann* held, "[i]n th[e] *sui generis* context [of foreign sovereign immunity], . . . it [is] more appropriate, absent contraindications, to defer to the most recent decision [of the political branches] than to presume that decision *inapplicable* merely because it postdates the conduct in question." *Ibid.* And, the petitioners stress, once the presumption of prospectivity is swept away, the NDAA is easily read to authorize punitive damages for completed conduct.

Really, this summary only begins to scratch the surface of the parties' debate. Sudan replies that it may be one thing to retract immunity retroactively consistent with *Altmann*, because all that does is open a forum to hear an otherwise available legal claim. But it is another thing entirely to create new rules regulating primary conduct and impose them retroactively. When Congress wishes to do *that*, Sudan says, it must speak just as clearly as *Landgraf* commanded. And, Sudan adds, the NDAA didn't simply open a new forum to hear a pre-existing claim; it also created a new cause of action governing completed conduct that the petitioners now seek to exploit. Cf. *Altmann*, 541 U. S., at 702–704 (Scalia, J., concurring). In turn, the petitioners retort that *Altmann* itself might have concerned whether a new forum could hear an otherwise available and pre-existing claim, but its reasoning went further. According to the petitioners, the decision also strongly suggested that the presumption of prospectivity does not apply at all when it comes to suits against foreign sovereigns, full stop. These points and more the parties develop through much of their briefing before us.

As we see it, however, there is no need to resolve the parties' debate over interpretive presumptions. Even if we assume (without granting) that Sudan may claim the benefit of *Landgraf*'s presumption of prospectivity, Congress was

as clear as it could have been when it authorized plaintiffs
to seek and win punitive damages for past conduct using
§1065A(c)'s new federal cause of action. After all, in
§1083(a), Congress created a federal cause of action that ex-
pressly allows suits for damages that "may include eco-
nomic damages, solatium, pain and suffering, and *punitive
damages*." (Emphasis added.) This new cause of action was
housed in a new provision of the U. S. Code, 28 U. S. C.
§1605A, to which the FSIA's usual prohibition on punitive
damages does not apply. See §1606. Then, in §§1083(c)(2)
and (c)(3) of the very same statute, Congress allowed cer-
tain plaintiffs in "Prior Actions" and "Related Actions" to
invoke the new federal cause of action in §1605A. Both pro-
visions specifically authorized new claims for preenactment
conduct. Put another way, Congress proceeded in two
equally evident steps: (1) It expressly authorized punitive
damages under a new cause of action; and (2) it explicitly
made that new cause of action available to remedy certain
past acts of terrorism. Neither step presents any ambigu-
ity, nor is the NDAA fairly susceptible to any competing in-
terpretation.

Sudan's primary rejoinder only serves to underscore the
conclusion. Like the court of appeals before it, Sudan
stresses that §1083(c) *itself* contains no express authoriza-
tion of punitive damages. But it's hard to see what differ-
ence that makes. Sudan admits that §1083(c) authorizes
plaintiffs to bring claims under §1605A(c) for acts commit-
ted before the 2008 amendments. Sudan concedes, too, that
§1605A(c) authorizes plaintiffs to seek and win "economic
damages, solatium, [and] pain and suffering," for preenact-
ment conduct. In fact, except for the two words "punitive
damages," Sudan accepts that *every other* jot and tittle of
§1605A(c) applies to actions properly brought under
§1083(c) for past conduct. And we can see no plausible ac-
count on which §1083(c) could be clear enough to authorize
the retroactive application of all other features of

§1605A(c), just not these two words.

Sudan next contends that §1605A(c) fails to authorize ret-roactive punitive damages with sufficient clarity because it sounds equivocal—the provision says only that awards "may" include punitive damages. But this language simply vests district courts with discretion to determine whether punitive damages are appropriate in view of the facts of a particular case. As we have repeatedly observed when dis-cussing remedial provisions using similar language, "the 'word "may" *clearly* connotes discretion.'" *Halo Electronics, Inc.* v. *Pulse Electronics, Inc.*, 579 U. S. ___, ___ (2016) (slip op., at 8) (quoting *Martin* v. *Franklin Capital Corp.*, 546 U. S. 132, 136 (2005), in turn quoting *Fogerty* v. *Fantasy, Inc.*, 510 U. S. 517, 533 (1994); emphasis added). What's more, all of the categories of special damages mentioned in §1605A(c) are provided on equal terms: "[D]amages *may* include economic damages, solatium, pain and suffering, and punitive damages." (Emphasis added.) Sudan admits that the statute vests the district court with discretion to award the first three kinds of damages for preenactment conduct—and the same can be no less true when it comes to the fourth.

That takes us to Sudan's final argument. Maybe Con-gress did act clearly when it authorized a new cause of ac-tion and other forms of damages for past conduct. But be-cause retroactive damages of the *punitive* variety raise special constitutional concerns, Sudan says, we should cre-ate and apply a new rule requiring Congress to provide a super-clear statement when it wishes to authorize their use.

We decline this invitation. It's true that punitive dam-ages aren't merely a form a compensation but a form of pun-ishment, and we don't doubt that applying new punish-ments to completed conduct can raise serious constitutional questions. See *Landgraf*, 511 U. S., at 281. But if Congress

*clearly* authorizes retroactive punitive damages in a manner a litigant thinks unconstitutional, the better course is for the litigant to challenge the law's constitutionality, not ask a court to ignore the law's manifest direction. Besides, when we fashion interpretive rules, we usually try to ensure that they are reasonably administrable, comport with linguistic usage and expectations, and supply a stable backdrop against which Congress, lower courts, and litigants may plan and act. See *id.*, at 272–273. And Sudan's proposal promises more nearly the opposite: How much clearer-than-clear should we require Congress to be when authorizing the retroactive use of punitive damages? Sudan doesn't even try to say, except to assure us it knows a super-clear statement when it sees it, and can't seem to find one here. That sounds much less like an administrable rule of law than an appeal to the eye of the beholder.

\*

With the question presented now resolved, both sides ask us to tackle other matters in this long-running litigation. Perhaps most significantly, the petitioners include a postscript asking us to decide whether Congress also clearly authorized retroactive punitive damages in claims brought by foreign-national family members under state law using §1605A(a)'s exception to sovereign immunity. Sudan insists that, if we take up that question, we must account for the fact that §1605A(a), unlike §1605A(c), does not expressly discuss punitive damages. And in fairness, Sudan contends, we should also resolve whether litigants may invoke state law at all, in light of the possibility that §1605A(c) now supplies the exclusive cause of action for claims involving state-sponsored acts of terror.

We decline to resolve these or other matters outside the question presented. The petitioners chose to limit their petition to the propriety of punitive damages under the federal cause of action in §1605A(c). See Pet. for Cert. i. The

Solicitor General observed this limitation in the question presented at the petition stage. See Brief for United States as *Amicus Curiae* 19, n. 8. The parties' briefing and argument on matters outside the question presented has been limited, too, and we think it best not to stray into new terrain on the basis of such a meager invitation and with such little assistance.

Still, we acknowledge one implication that necessarily follows from our holding today. The court of appeals refused to allow punitive damages awards for foreign-national family members proceeding under state law for "the same reason" it refused punitive damages for the plaintiffs proceeding under §1605A(c)'s federal cause of action. 864 F. 3d, at 818. The court stressed that it would be "puzzling" if punitive damages were permissible for state claims but not federal ones. *Id.,* at 817. Having now decided that punitive damages *are* permissible for federal claims, and that the reasons the court of appeals offered for its contrary decision were mistaken, it follows that the court of appeals must also reconsider its decision concerning the availability of punitive damages for claims proceeding under state law.

The judgment of the court of appeals with respect to punitive damages is vacated. The case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KAVANAUGH took no part in the consideration or decision of this case.